Douglas J. Serdahely
Patton Boggs LLP
601 West Fifth Avenue, Suite 700
Anchorage, AK 99501
(907) 263-6300 Phone
(907) 263-6345 Fax

*Attorneys for Defendant Exxon Shipping Company*

John F. Clough, III
P.O. Box 211187
Auke Bay, AK 99821
(907) 790-1912 Phone
(907) 790-1913 Fax

*Attorneys for Defendant Exxon Mobil Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>        Plaintiff,<br><br>  v.<br><br>EXXON CORPORATION, EXXON SHIPPING COMPANY, and EXXON PIPELINE COMPANY, *et al., in personam,* and the T/V EXXON VALDEZ, *in rem,*<br><br>        Defendants. | No. 3:91-cv-0083 Civil (HRH) |

**DEFENDANT EXXON MOBIL CORPORATION'S
MOTION TO ENFORCE THE CONSENT DECREE**

# MEMORANDUM IN SUPPORT OF DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO ENFORCE THE CONSENT DECREE

## I.    INTRODUCTION

Pursuant to the Reopener for Unknown Injury (the "**Reopener**"), a provision of the 1991 Agreement and Consent Decree ("**Consent Decree**"), the United States and the State of Alaska (the "**Governments**") have submitted a demand that Exxon Mobil Corporation et al. ("**Exxon**") pay $92 million to finance the Governments' plan to reinstitute clean-up of the *Exxon Valdez* Oil Spill nearly twenty years after the Federal ("**FOSC**") and State On-Scene Coordinators ("**SOSC**") declared the clean-up complete. The Governments may not use the Reopener to subject Exxon to further obligations for clean-up as the Consent Decree expressly released Exxon from such obligations.

Accordingly, Exxon requests that the Court grant this Motion to Enforce the Consent Decree and issue an order stating that the Consent Decree released Exxon from financial obligations for further clean-up after the Final Approval of the Consent Decree and that any attempt to base a Reopener claim on a clean-up plan violates the Consent Decree.

## II.   STATEMENT OF FACTS

On October 8, 1991, this Court approved and entered the Consent Decree, which resolved all claims between Exxon and the Governments arising from the 1989 grounding of the *Exxon Valdez* and the resulting oil spill. Pursuant to the Consent Decree, Exxon paid $900 million to the Governments to settle all natural resource damages claims related to the oil spill. (*See* Declaration of Douglas Serdahely ("Serdahely Decl."), Ex. A (Consent Decree) at ¶¶ 8-10.) In consideration for the $900 million settlement, the Governments, among other things, released Exxon from further financial obligations with respect to clean-up of the oil spill upon Final Approval of the Consent Decree. (*See id.* at ¶¶ 6(i) & 11(b).)

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 2

Although the Consent Decree resolved all claims between Exxon and the Governments, it included a provision, the Reopener, which allowed the Governments to demand an additional $100 million from Exxon to fund *restoration projects* necessary to restore any population, habitat, or species that suffered a substantial loss or decline as a result of the oil spill, so long as that loss or decline could not have been known or reasonably anticipated at the time of the settlement. (*See id.* at ¶ 17.) Prior to making a demand for payment, the Reopener requires that the Governments submit a plan detailing the proposed restoration projects, the costs of the proposed projects, and the information that the Governments relied upon in preparing the plan. (*See id.* at ¶ 19.)

On May 31, 2006, the Governments submitted their "Comprehensive Plan for Habitat Restoration Project Pursuant to Reopener for Unknown Injury" (the "**Reopener Submission**") to Exxon. (*See* Serdahely Decl., Ex. B (Reopener Submission Cover Letter) at 1.) In the Reopener Submission, the Governments set forth a plan to (1) locate remaining oil; (2) identify factors limiting the natural degradation of oil; (3) identify and evaluate possible bioremediation technologies, as well as tilling and physical removal; (4) test candidate bioremediation technologies; (5) evaluate possible remediation alternatives; and (6) implement the selected remediation option. (*See* Serdahely Decl., Ex. C (Excerpt from "Comprehensive Plan for Habitat Restoration Projects Pursuant to Reopener for Unknown Injury").) On August 31, 2006, the Governments demanded payment of $92,240,982 from Exxon to implement the Reopener Submission, a plan that contemplates nothing more than clean-up. (*See* Serdahely Decl., Ex. D (Reopener Demand Letter, dated Aug. 31, 2006) at 1.)

Exxon has no obligation to fund the Governments' Reopener Submission because it is nothing more than a plan to resurrect the clean-up of the oil spill that was declared complete by

the Governments, through the FOSC and the SOSC, in June 1992. (*See* Serdahely Decl., Ex. E (FOSC and ADEC Joint Press Release). Indeed, the favored method of clean-up contemplated by the Reopener Submission—bioremediation—is the same method utilized by Exxon in 1991 and 1992 (*See* Serdahely Decl., Ex. F (Letter from Rear Adm. Ciancaglini, dated July 15, 1991) at 1; *See* Serdahely Decl., Ex. G (Exxon's 1992 Work Program Completion Report, dated August 1992) at Attachment 1.1), which evidences that the Governments are seeking additional funds for clean-up, not to fund a restoration plan as contemplated by the Reopener.

### III.  JURISDICTION

Prior to the execution of the Consent Decree, this Court had "jurisdiction over the claims set forth in the Federal Court Complaints and over the parties to this Agreement pursuant to, among other authorities, 28 U.S.C. §§ 1331, 1333 and 1345, and Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f)." (*See* Ex. A (Consent Decree) at ¶ 1.) Under the express terms of the Consent Decree, this Court has retained jurisdiction of this matter "for the purpose of entering such further orders, direction, or relief as may be appropriate for the construction, implementation, or enforcement of this Agreement." (*See id.* at ¶ 38.) *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (a federal court may retain ancillary jurisdiction to enforce a settlement agreement by either a separate provision stating that the court retains jurisdiction over the matter or "by incorporating the terms of the settlement agreement into the court's order").

### IV.  ARGUMENT

####   A.  The Governments Explicitly Extinguished Exxon's Clean-up Obligations

The plain language of the Consent Decree and the Governments' 1992 determination that clean-up of the oil spill was complete definitively extinguished Exxon's obligations, financial or otherwise, with respect to clean-up of the oil spill. As the Governments' Reopener Submission

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 4

is no more than a plan to reinstitute Exxon's financial obligations for clean-up, which the Governments declared complete in 1992, it is barred by the express terms of the Consent Decree.

> 1. **Under the Consent Decree, the Governments Released Exxon From Further *Financial* Obligations With Respect to Clean-up**
>
>> a. **Alaska Contract Principles Govern the Court's Construction of the Consent Decree**

Because consent decrees are similar to contracts, courts apply the principles governing contract interpretation when construing consent decrees. *Wicker v. Oregon*, 543 F.3d 1168, 1174 (9th Cir. 2008). Several courts in the Ninth Circuit have applied the contract principles of the state in which the consent decree was signed. *See Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994) (stating that the contract principles of the situs state govern the construction of the consent decree); *Gates v. Gomez*, 60 F.3d 525, 530 (9th Cir. 1995) (citing *Gates v. Rowland*, 39 F.3d at 1444, for the principle that the consent decree is interpreted by the contract principles of the state where the consent decree was signed); *Wicker*, 543 F.3d at 1174 (citing *Gates v. Gomez*, 60 F.3d at 530, for the principle that the consent decree is construed in accordance with the contract principles of the state where the consent decree was entered).[1] As the Consent Decree was entered into in Alaska, the contract principles of Alaska govern the Court's interpretation of the Consent Decree.

Under Alaska law, the Court's "primary goal" in interpreting the Consent Decree is to determine and give effect to the "parties' reasonable expectations." *See Brotherton v. Warner*,

---

[1] Another line of Ninth Circuit cases instead relies on general principles of contract interpretation when construing consent decrees, holding that the consent decree must be interpreted within its four corners and that extrinsic evidence may be considered to resolve an ambiguity in the decree. *See, e.g., United States v. Asarco*, 430 F.3d 972, 980-981 (9th Cir. 2005). Should this Court conclude that this line of cases represented by *United States v. Asarco* governs instead of Alaska law, the proceeding analysis will not be affected, even where the contract principles of Alaska may differ, because the extrinsic evidence provided plainly supports the language in the Consent Decree, which unambiguously releases Exxon for financial responsibility for further clean-up upon Final Approval of the Consent Decree.

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 5

240 P.3d 1225, 1229 (Alaska 2010) (citation and internal quotations omitted); *see Estate of Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007) (stating that the court's "duty is to ascertain and give effect to the reasonable intentions of the contracting parties") (citation and internal quotations omitted). The reasonable expectations of the parties may be discerned by looking at the plain language of the written agreement; extrinsic evidence, including evidence of course of performance regarding the parties' intent at the time the contract was made; and case law interpreting comparable provisions. *Brotherton*, 240 P.3d at 1229 (citation and internal quotations omitted); *Estate of Polushkin*, 170 P.3d at 167 & 171 (Alaska 2007). Notably, there is no requirement that an agreement be ambiguous before "looking to extrinsic evidence as an aid in determining what it means." *Id.*

> b. The Plain Language of the Consent Decree Discharges Exxon's Financial Obligations for Clean-up

The Court need only look within the four corners of the Consent Decree and examine the plain language of paragraph 11(b) to discern that the Governments agreed that Exxon would have no further financial obligations with regards to clean-up upon Final Approval[2] of the Consent Decree. Paragraph 11(b) of the Consent Decree states, in relevant part:

> Upon Final Approval, Exxon *shall have no further obligations with respect to clean-up* except as set forth in this Agreement and in addition Exxon shall be entitled to a credit, to be applied to the next payment due from Exxon to the Governments, as provided in

---

[2] Final Approval is defined in the Consent Decree as:

> . . . the earliest date on which all of the following has occurred: (1) the Court has approved and entered the Agreement as a judgment, without modification and without interpreting a material term of the Agreement, prior to or at the time of approval, in a manner inconsistent with the Parties' intention; and (2) the time for appeal from that judgment has expired without filing of an appeal, or the judgment has been upheld on appeal and either the time for further appeal has expired without the filing of a further appeal or no further appeal is allowed.

(*See id.* at ¶ 6(i).)

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 6

> subparagraph 8(b), for all Expenditures incurred by Exxon for clean-up work [conducted] pursuant to . . . subparagraph 11(a).

(*See* Ex. A (Consent Decree) at ¶ 11(b)) (emphasis added). Those "further obligations" referenced in paragraph 11(b) are set forth in paragraph 11(a), wherein Exxon agreed to conduct clean-up *work* after the Effective Date[3] of the Consent Decree under the direction of the FOSC and the SOSC.[4] Notably, as explicitly set forth in paragraph 11(b), Exxon received a credit for all expenditures incurred as a result of the clean-up conducted during this period. (*Id.*) This express credit for future expenditures demonstrates that the $900 million settlement amount covered any and all additional clean-up costs and relieved Exxon of further financial obligations for clean-up upon Final Approval of the Consent Decree.

Although the Consent Decree does not explicitly define "clean-up," the activities contemplated by the Governments' Reopener Submission are those considered by the parties to constitute "clean-up." This may be readily discerned by reference to the actions Exxon undertook from the Effective Date of the Consent Decree until June 1992, pursuant to its agreement to conduct clean-up in accordance with the directives of the FOSC and the SOSC. During the 1991 and 1992 clean-up operations, the FOSC and the SOSC identified shorelines that required treatment and removal of oil deposits. (*See* Ex. F (Letter from Rear Adm.

---

[3] The Effective Date is defined in the Consent Decree as "the earliest date on which all of the Parties have signed this agreement." (*See id.* at ¶ 6(h).)

[4] Paragraph 11(a) provides:

> Exxon shall continue clean-up work relating to the oil spill after the Effective Date, as directed by and in accordance with the directions of the Federal On-Scene Coordinator ("FOSC"), subject to prior approval by the FOSC of the costs of work directed by the FOSC. After the Effective Date, Exxon shall also perform any additional clean-up work directed by the State On-Scene Coordinator ("State OSC") that does not interfere or affirmatively conflict with work directed by the FOSC or with federal law, in accordance with the directions of, and subject to prior approval of costs by, the State OSC…

(*See id.* at ¶ 11(a).)

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 7

Ciancaglini, dated July 15, 1991) at 1; See Ex. G (Exxon's 1992 Work Program Completion Report, dated August 1992).) Exxon removed oil through the use of hand tools, mechanical equipment, tilling and raking, and the application of bioremediation technologies. (*Id.*) Exxon carried out these operations under the direction and approval of the Governments and was reimbursed for the costs of these activities in accordance with ¶ 11(b) of the Consent Decree. Undoubtedly, these actions demonstrate that the parties understood clean-up to encompass these techniques of oil removal—including bioremediation—the very removal technology contemplated by the Reopener Submission.

> **2. The Governments' Carefully Considered Determination That Clean-up of the Oil Spill was Complete Discharged Exxon's Remaining Obligations With Respect to Clean-up**

In June of 1992, the FOSC and the SOSC declared the clean-up complete, fully discharging Exxon from any further obligations, financial or otherwise, for clean-up of the oil spill. (*See* Ex. E (FOSC and ADEC Joint Press Release, dated June 12, 1992.) They reached this conclusion collectively and deliberately and in reliance on the advice of experienced consultants. It was also based on data collected during the 1991 and 1992 shoreline assessments and clean-up, all of which suggested that although not all the oil had been removed, further clean-up would not result in any net environmental benefit.

The concern that further clean-up of the oil spill would not result in any net environmental benefit was raised by the FOSC and the SOSC well before their decision in June 1992 to declare the clean-up complete. Prior to the 1991 shoreline assessments and clean-up, the National Oceanic and Atmospheric Administration ("**NOAA**"), a key advisor to the FOSC throughout the clean-up, cautioned that the clean-up effort was reaching "the point of diminishing returns" and urged the FOSC to strike "a balance between any benefits that may be derived from removing oil and the potential for compounding injury to the environment through

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 8

the use of increasingly intrusive treatment methods." (*See* Serdahely Decl., Ex. H (NOAA's Review of the Status of Prince William Sound Shorelines, dated March 15, 1991) at 1.) In March 1991, the SOSC reached the same conclusion as the NOAA, finding that the clean-up was reaching its "practical and beneficial limits" and that "it ma[de] more sense to leave much of the subsurface oil in place." (*See* Serdahely Decl., Ex. I (Letter from Ernest Piper, dated March 11, 1991) at 1.)

In light of the concerns raised by NOAA and the SOSC, clean-up in 1991 and 1992 was driven by the principle of "net environmental benefit," i.e., clean-up should only go forward where the benefits might outweigh the harms to the environment caused by further treatment. (*See* Ex. F (Letter from Rear Adm. Ciancaglini, dated July 15, 1991) at 1; *See* Ex. G (Exxon's 1992 Work Program Completion Report, dated August 1992).) Upon the conclusion of the 1992 shoreline assessments and the clean-up of 63 specifically targeted shorelines, the FOSC and the SOSC independently concluded that the clean-up had, in fact, reached the point of diminishing returns. (*See* Serdahely Decl., Ex. J (Letter from Rear Adm. Ciancaglini, dated June 10, 1992) at 1; *See* Serdahely Decl., Ex. K (*Exxon Valdez* Oil Spill Restoration Project Final Report, dated June 1996) at 14.) This decision to declare the clean-up complete came after two consecutive shoreline assessments and clean-ups driven by the principle that clean-up should only go forward if the net benefits might outweigh the environmental harm. In short, the Governments' decision to declare the clean-up complete was fact-based, fully considered, and premised on the well-supported conclusion that further clean-up efforts would cause more harm than good. Indeed, this decision has not been revised and no additional clean-up has been undertaken for nearly 20 years.

Upon declaration that the clean-up was complete in June of 1992, Exxon had no further obligations, whatsoever, with respect to clean-up of the oil spill, as the Consent Decree expressly

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 9

Case 3:91-cv-00083-HRH   Document 309   Filed 09/13/11   Page 9 of 14

conditioned Exxon's obligation to conduct *further* clean-up work upon the directives of the FOSC and the SOSC. (*See* Ex. A (Consent Decree) at ¶ 11(b).)

### B. The Unequivocal Aim of the "Reopener Submission" is to Reinstate Exxon's Financial Obligations for Clean-up

The Reopener Submission is a proposal to clean-up the lingering oil by reinstituting the use of bioremediation, among other removal technologies, that was used in the clean-up operations that ended in 1992. As such, it is no more than a plan to reopen the clean-up that was concluded nearly twenty years ago and to subject Exxon to further financial obligations in violation of paragraph 11(b) of the Consent Decree. The Reopener Submission implicitly concedes this point as it acknowledges that bioremediation was utilized during the clean-up of the oil spill. (*See* Serdahely Decl., Ex. L (Excerpt from Comprehensive Plan for Habitat Restoration Project Pursuant to Reopener for Unknown Injury) at 49.) The Governments' attempt to use the Reopener Submission to subject Exxon to further financial obligations with respect to clean-up is also evidenced by the May 31, 2006 letter accompanying the Reopener Submission, which acknowledges Exxon's previous and "extensive oil removal efforts under the governments' oversight," and lays out the Governments' step-by-step plan to resume that clean-up. (*See* Ex. B (Reopener Submission Cover Letter) at 2 ) (stating that the goals of the Reopener Submission are to locate residual deposits of oil and to "accelerate the natural processes of degradation and dispersal of the lingering oil . . .").)

As the Consent Decree provides that Exxon was and is no longer financially obligated for clean-up of the oil spill (*See* Ex. A (Consent Decree) at ¶ 11(b)), the Governments may not extract payments from Exxon pursuant to the Reopener without violating the express terms of the Consent Decree.

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 10

## C. The Governments Cannot Sidestep the Bar Against Additional Clean-Up Liability by Recasting the Work as "Restoration"

The Reopener is expressly and exclusively limited to restoration projects, as it provides that "Exxon shall pay to the Governments such additional sums as are required for the performance of *restoration* projects" and it limits such projects "to *restor[ing]* one or more populations, habitats, or species." (*See id.* at ¶ 17) (emphasis added). The reference to "restoration projects" in the Reopener cannot be read to encompass further clean-up work as the parties expressly distinguish between "restoration," which is the subject of the Reopener Clause, and "clean-up," which is excluded from Exxon's future financial liability, throughout the Consent Decree

For instance, when defining the "Oil Spill," the parties treated "cleanup" [sic] and "restoration activities" as separate consequences proximately caused by the oil spill. (*See id.* at ¶ 6(g).) Next, when articulating how Exxon's payments to the Governments would be applied, the parties drew a distinction between reimbursement for "clean-up costs" and reimbursement for "restoration." (*See id.* at ¶ 10.) The parties similarly distinguished reimbursement for "clean-up costs" from reimbursement for "natural resource damages assessment costs," which expressly include "restoration planning." (*Id.*) Furthermore, when listing the claims Exxon releases and covenants not to sue, the parties distinguished between claims for "Natural Resource Damages" and claims for "cleanup costs." (*See id.* at ¶ 20.) As the Consent Decree defines "Natural Resource Damages" as encompassing the costs of "restoration," this serves as yet another example of the parties expressly differentiating between "clean-up" and "restoration." (*See id.* at ¶ 6(d).)

The parties' explicit differentiation of "clean-up" and "restoration" throughout the Consent Decree evidences the parties' intent to assign distinct meanings to these terms. Since

the parties attributed different meanings to these terms, one may conclude that where one term is present and the other is absent, the absence of one is meaningful and intentional. Thus, where the Reopener is completely silent as to clean-up but specifically references restoration, the inescapable conclusion is that the omission of clean-up was deliberate and evidenced the parties' intent that Exxon only be obligated to pay additional sums for restoration projects, assuming all other requirements set forth in the Reopener are met.[5]

## V. CONCLUSION

For the foregoing reasons, Exxon requests that the Court grant this Motion to Enforce the Consent Decree and issue an order confirming that the Consent Decree discharges Exxon's financial obligations with respect to clean-up and declaring that any attempt by the Governments to extract sums of money from Exxon by basing a Reopener claim on a clean-up plan constitutes a violation of the Consent Decree.

---

[5] Even if the Court were to conclude that the definition of restoration permissibly includes clean-up (or that the parties intended that restoration encompasses clean-up), as set forth *infra*, paragraph 11(a) of the Consent Decree still precludes Exxon from being subjected to further financial obligations for that clean-up, regardless of whether the clean-up is contemplated by a restoration plan drafted pursuant to the Reopener.

*State of Alaska v. Exxon Corporation, et al.*, Case No. 3:91-cv-0083-HRH
Page 12

Respectfully submitted this 13th day of September 2011.

    s/ Douglas J. Serdahely
    PATTON BOGGS LLP
    601 W. 5th Avenue, Suite 700
    Anchorage, Alaska 99501
    Tel: (907) 263-6310
    Fax: (907) 263-6345
    ABA No. 7210072
    E-mail: dserdahely@pattonboggs.com

    s/ John F. Clough, III (consent)
    CLOUGH & ASSOCIATES PC
    PO Box 211187
    Auke Bay, Alaska 99821
    Tel: (907) 790-1912
    Fax: (907) 790-1913
    ABA No. 8106011
    E-mail: cloughpc@alaska.net

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of September 2011, a copy of the foregoing document was served by the Court's Electronic Case Management system upon all persons registered to receive filings in this matter, including:

> Jennifer L. Schorr
> Assistant Attorney General
> Alaska Department Law
> Email: Jennifer.Schorr@alaska.gov

By:   s/Douglas J. Serdahely
      PATTON BOGGS LLP