JOHN J. BURNS
ATTORNEY GENERAL

JENNIFER L. SCHORR
Assistant Attorney General
State of Alaska
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501-1994
Telephone: (907) 269-5274
Facsimile: (907) 278-7022
Email: Jennifer.Schorr@alaska.gov

Attorneys for the State of Alaska

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) No. 3:91-CV-0083 (HRH) |
| | ) |
| v. | ) **OPPOSITION OF** |
| | ) **PLAINTIFF STATE OF** |
| EXXON CORPORATION, and EXXON | ) **ALASKA TO DEFENDANT** |
| SHIPPING COMPANY, | ) **EXXON MOBIL** |
| | ) **CORPORATION'S** |
| Defendants. | ) **MOTION TO ENFORCE** |
| | ) **THE CONSENT DECREE** |

I. **INTRODUCTION**

Defendant Exxon Mobil Corporation ("Exxon") has moved this Court to enforce the

1991 Consent Decree and declare that any attempt by the United States and the State of Alaska

(the "Governments") to base a claim under the "Reopener for Unknown Injury" provision

("Reopener") on a "clean-up plan" constitutes a violation of the Consent Decree. The State of

Alaska opposes Exxon's motion.[1] Exxon's motion should be denied, first, because it seeks resolution of issues that are not properly before the Court. Under the Consent Decree, the right to seek relief under the Reopener provision belongs to the Governments. Until and unless the Governments file a claim with this Court to enforce the Reopener, evaluation of the merits of a potential claim under the Reopener would be premature. Similarly, ripeness considerations indicate that the Court should not review Exxon's motion. For example, the Court's consideration of the merits of the "Comprehensive Plan for Habitat Restoration" ("Plan") would benefit from the further factual development that is occurring as work continues to refine the Plan, the Court's consideration of these issues now may prove to have been unnecessary, and Exxon would not suffer significant hardship from deferring consideration of the merits of a potential claim under the Reopener until and unless the Governments seek to enforce it.

Even if the Court determines that Exxon's motion presents issues that are appropriate for judicial review at this time, the motion should be denied because Exxon's arguments are not consistent with the unambiguous terms of the Consent Decree. Exxon's argument that any action designed to accelerate natural degradation of lingering oil is exclusively a "clean-up" action, and therefore not a valid "restoration" action under the Reopener, is merely an attempt to create an exception to the Reopener that was not negotiated by the Parties. The Reopener

---

[1] This Opposition is substantively identical to the Opposition filed by the United States in No. 3:91-CV-0082 (HRH), in which the State of Alaska concurred. (3:91-cv-0082, ECF No. 373). As noted by the United States in that filing, Exxon had not filed a Motion to Enforce the Consent Decree in the current case. *Id.* at FN 1. In response, on September 13, 2011 Exxon did file the same Motion to Enforce the Consent Decree in the current case. The Declaration of Kimberly A. Trust attached hereto as Exhibit 1 is likewise the same Declaration as that filed by the United States. (3:91-cv-0082, ECF No. 373-1).

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                    Page 2 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 2 of 20

applies "[n]otwithstanding any other provision" of the Consent Decree, and therefore, Exxon's financial obligations under the Reopener would supersede any release of Exxon from further financial obligation for "clean-up" actions provided by other provisions. Decree (ECF No. 310-2), ¶ 17.  And Exxon's assertion that no form of bioremediation can qualify as "restoration" because it is within the range of actions that were used in the "clean-up" phase is unsupported by law and defies logic.  Eliminating or reducing the exposure of natural resources to contamination is an appropriate goal (though subject to differing standards and administered by different decision-makers) for both clean-up and restoration, and to deny trustees the right to use in restoration all tools that had been or could be used in the clean-up, as Exxon appears to argue, would risk denying them the most efficient and effective means of accomplishing restoration in a given case.  Although the Reopener contains a number of specific limitations and conditions on its use, the exception Exxon seeks to add – that proposed restoration actions cannot overlap with methods used or available for the clean-up – is not among them.

## II.     STATEMENT OF FACTS

Exxon's motion is directed at the terms of the "Reopener for Unknown Injury" portion of the Consent Decree.  Paragraph 17 of the Reopener provides as follows:

> Notwithstanding any other provision of this Agreement, between September 1, 2002, and September 1, 2006, Exxon shall pay to the Governments such additional sums as are required for the performance of restoration projects in Prince William Sound and other areas affected by the Oil Spill to restore one or more populations, habitats, or species which, as a result of the Oil Spill, have suffered a substantial loss or a substantial decline in the areas affected by the Oil Spill; provided, however, that for a restoration project to qualify for payment under this paragraph the project must meet the following requirements:

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                                   Page 3 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 3 of 20

> (a) the cost of a restoration project must not be grossly disproportionate to the magnitude of the benefits anticipated from the remediation; and
>
> (b) the injury to affected populations, habitats, or species could not reasonably have been known nor could it reasonably have been anticipated by any Trustee from any information in the possession of or reasonably available to any Trustee on the Effective Date.

Decree, ¶ 17.

The Reopener limits the amount to be paid by Exxon for the restoration projects under Paragraph 17 to $100,000,000. *Id.* ¶ 18. The Reopener also specifies that the Governments provide to Exxon, ninety days before demanding a payment under Paragraph 17, "detailed plans for all such restoration projects, together with a statement of all amounts [the Governments] claim should be paid under Paragraph 17 and all information upon which [the Governments] relied in the preparation of the restoration plan and the accompanying cost statement." *Id.* ¶ 19.

Since 2001, new information had emerged that relatively unweathered oil remained in the subsurface of beaches in Prince William Sound and the Gulf of Alaska. ECF No. 310-3; Declaration of Kimberly A. Trust ("Decl."), ¶¶ 3, 4 (attached hereto as Ex.1). This lingering oil had been degrading at a far slower rate than was anticipated at the time the Parties entered into the Consent Decree and had remained toxic and available to natural resources, such as sea otters and harlequin ducks, which use these intertidal habitats. *Id.* at ¶4. In 2006, in accordance with Paragraph 19 of the Reopener, the Governments took the threshold step of sending Exxon the Plan to address this lingering oil, followed by a demand for payment from Exxon of $92,240,982. ECF Nos. 310-3 and 310-5.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                 Page 4 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 4 of 20

The unexpected discovery of the lingering oil raised questions that needed to be addressed before the Governments could finalize the details of a restoration plan that would effectively address the lingering oil. Decl., ¶ 5 (Plan at 1). These questions included the locations and extent of lingering oil, factors limiting the natural degradation of oil, and whether technologies could be developed to effectively accelerate the natural processes of degradation and dispersal of lingering oil. *Id.* As a result, the Governments' Plan provides for a "flexible, phased approach that explicitly allows for adjustments as information is developed and contemplates public review and input at key points throughout the process." ECF No. 310-3; Decl., ¶ 3 (Plan at 16).

Since submitting the Plan to Exxon, and making it available to the public, the Governments have commissioned several studies designed to answer the questions identified in the Plan. Decl., ¶ 6. Some but not all of the studies anticipated by the Plan are complete. *Id.* Various studies have been conducted regarding the effects of lingering oil on wildlife; some of these studies are complete and others are ongoing. *Id.* at ¶ 7. Studies that help to more accurately predict the extent and locations of lingering oil are complete. *Id.* at ¶ 8. A pilot study to determine the feasibility of a new bioremediation technique, which is designed to deploy nutrients and oxygen below the surface of the beaches to better reach lingering oil and more effectively accelerate degradation, is ongoing. *Id.* at ¶ 9. The development of the pilot study required completion of several initial studies, including a study to identify the factors limiting natural degradation. *Id.* The field work for the bioremediation pilot study is expected to be complete in mid-September of this year, and an analysis of the findings of the study is expected by spring, 2012. *Id.*

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)    Page 5 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 5 of 20

After completion of the remaining studies, the Governments will assess the information provided by the studies regarding the injuries, extent of lingering oil and possibility of restoration. *Id.* at ¶ 10. The Governments will then determine the next steps to make final decisions regarding whether, and what types of, actions are feasible and appropriate to restore the injured habitats. *Id.* As identified in the Plan, if an effective treatment technology is identified, the Governments will evaluate implementation "in light of the environmental benefit, likely costs, and public input." Decl., ¶ 11 (Plan at 17). The information from the pilot study, therefore, could help refine the initial demand made to Exxon in 2006 and the amount of any Reopener claim that the Governments might file. *Id.* at ¶ 12. Thus, the Governments do not plan to file a claim to enforce the Reopener and require Exxon to fund the Plan until the remaining studies anticipated by the Plan are complete.

## III. ARGUMENT

### A. Exxon's Motion is Premature and not Appropriate for Judicial Review at This Time.

#### 1. Exxon's motion is premature under the terms of the Consent Decree.

Exxon seeks an order declaring that "any attempt" by the Governments to base a Reopener claim on a restoration plan that includes techniques of bioremediation, which Exxon argues is exclusively a "clean-up" action, constitutes a violation of the Consent Decree. ECF No. 309 at 2. Exxon's motion is premature because the Governments have only taken the threshold step of submitting the Plan and a demand for payment to Exxon in accordance with the terms of the Reopener. Decree, ¶¶ 17, 19. The Governments have not yet filed a claim requesting that the Court enforce the Reopener and require Exxon to fund the Plan.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                   Page 6 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 6 of 20

The Reopener gives the Governments the authority to collect from Exxon the additional sums required for the performance of restoration projects in areas affected by the Oil Spill if the conditions specified in the Reopener are met. Accordingly, in its March 7, 2011 Order, the Court emphasized that "the possible Reopener claim belongs to the Governments." 3:91-cv-0082, ECF No. 362 at 4. The Court also stressed that development of the Governments' claim was ongoing, that evaluation of the merits of a claim to reopen the case under the Reopener provision would be premature, and that it could be prejudicial to weigh in prematurely on the merits of a Reopener claim. *Id.* at 4-5.

Under these circumstances, Exxon's motion clearly is premature. As recognized by the Court, the Consent Decree provides that the Governments retain the discretion when and whether to request that the Court enforce a claim under the Reopener. The Governments also retain the discretion to determine the scope and amount of any claim they ask the Court to enforce. The Governments' filed claim could not exceed (in current dollars) the amount of their 2006 demand but could be smaller if appropriate given the results of the subsequent studies. The Governments are moving forward with developing their claim, and have completed the majority of the studies designed to help refine the Plan. However, as described above, not all of the studies are complete. Perhaps most significantly, the pilot testing of bioremediation technologies on the lingering oil is expected to conclude in September, and the analyses and conclusions from that study are expected to be completed in spring, 2012. The results of that pilot testing are expected to provide valuable information about the type and feasibility of bioremediation that is called for. Accordingly, those results may impact the final Plan, including its scope, and thus may affect the amount of any demand that the Governments might seek from this Court pursuant to the

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH) Page 7 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 7 of 20

Reopener. Because the information still being developed may refine the Plan, and thus cause changes to the Governments' demand to Exxon and the amount of any claim that the Governments seek to enforce, the Governments do not plan to seek Court enforcement of any payment demand under the Reopener until the remaining studies are complete. Only if and when the Governments do so would the merits of any claim under the Reopener properly be before the Court. At that time, Exxon would be free to make its arguments in opposition to the Governments' claim.

### 2. The Ripeness Doctrine Also Suggests that Exxon's Motion is Premature.

By analogy, ripeness considerations also indicate that the Court should not review Exxon's motion at this time. In the administrative context, the ripeness requirement is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) ("*Ohio Forestry*") (quoting *Abbott Lab. v. Gardner*, 387 U.S. 136, 148-149 (1967). A claim is not ripe when it rests upon future events that may not occur as anticipated, or

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)   Page 8 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 8 of 20

may not occur at all.  *See, e.g., Ass'n of Am. Medical Colleges v. United States*, 217 F.3d 770, 782 (9th Cir. 2000) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).[2]

Under the circumstances present here, judicial review should be eschewed to allow the Governments to conclude their ongoing process and to avoid having the Court opine at this preliminary stage.  *See Ass'n of Am. Medical Colleges*, 217 F.3d at 780 (in evaluating whether an issue is fit for judicial decision in ripeness context, the core question regarding finality is whether the agency has completed its decisionmaking process and whether the result of that process will directly affect the parties).  There is no dispute that further consideration of the Plan will occur before it becomes final and the Governments potentially seek to enforce the Reopener.  *See Ohio Forestry*, 523 U.S. at 735-36; *Friends of Potter Marsh,* 371 F. Supp.2d at 1124-25.  Judicial review now, while the Governments are completing studies related to the Plan, would interfere with that process.  *See, e.g., Friends of Potter Marsh,* 371 F. Supp.2d at 1124-25.  In addition, the Court may well benefit from the further factual development that will occur in connection with the ongoing studies and refinement of the Plan.  In further defining how to implement the Plan, the Governments will develop a fuller background that addresses, *inter alia*, what the Plan entails, its feasibility, and the environmental and natural resource benefits (and potential detriments, if any) of the Plan.  Reviewing the Plan now would require the Court to

---

[2]   To evaluate ripeness, courts evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *See Abbott Lab.,* 387 U.S. at 148-49; *Friends of Potter Marsh v. Peters*, 371 F. Supp.2d 1115, 1123 (D. Alaska 2005).  To do so, the courts consider:  (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.  *See Ohio Forestry*, 523 U.S. at 733; *Friends of Potter Marsh*, 371 F. Supp.2d at 1123.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                          Page 9 of 20

conduct that review without the benefit of that additional information. In contrast, review later, if and when the Governments seek to enforce the Reopener, and where the "factual components [have been] fleshed out," would allow the Court to engage in more informed review. *Ohio Forestry*, 523 U.S. at 736-37. *See, e.g.*, *Ass'n of Am. Medical Colleges*, 217 F.3d at 780-82; *Friends of Potter Marsh,* 371 F. Supp.2d at 1125.

Moreover, depending upon the results of the ongoing studies and Plan development, and discussions with Exxon, review now may turn out to have been unnecessary. *See, e.g., Ohio Forestry*, 523 U.S. at 736; *Ass'n of Am. Medical Colleges*, 217 F.3d at 782. If the Plan is adjusted significantly, then review of the Plan now would have been fruitless, and if the Governments and Exxon reach an agreement on a payment amount under the Reopener, then no review at all would have been required.[3]

Conversely, to withhold judicial consideration at this time would not cause Exxon significant hardship. *See, e.g., Ohio Forestry*, 523 U.S. at 733-35; *Abbott Lab.*, 387 U.S. at 149. In the ripeness context, there is not sufficient hardship if the actions challenged "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; [and] they create no legal rights or obligations." *Friends of Potter Marsh,* 371 F. Supp.2d at 1123 (quoting *Ohio Forestry*, 523 U.S. at 733). That is the situation here. In addition, while Exxon may deem it beneficial to have its concerns addressed now, more steps

---

[3] After the studies are complete and the Governments determine the appropriate next steps, the Governments anticipate discussing with Exxon its interest in participating in those next steps, which could result in an out-of-court resolution of the Governments' demand and avoid entirely the need for this Court's review of the merits of the demand. *Cf.* 3:91-cv-0082, ECF No. 362 at 5.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                       Page 10 of 20

would need to be taken before the Governments would seek to enforce the Reopener, and the disadvantages to the Governments and this Court of a premature review that would benefit from further factual development and may prove unnecessary should outweigh such potential benefits to Exxon.  *See Ohio Forestry*, 523 U.S. at 734; *Friends of Potter Marsh*, 371 F. Supp.2d at 1123-24.  Further, the Plan was sent to Exxon on May 31, 2006, so Exxon has already waited over five years to challenge the Plan.  Exxon has not demonstrated any harm that would result from deferring further the consideration of the Plan.  Moreover, neither the Governments' sending the Plan to Exxon in 2006 nor any other Plan-related activity after that date affected Exxon's rights to challenge the Governments' ability to recover payment from Exxon if the Governments seek to enforce the Reopener.  If the Governments seek to have this Court enforce the Reopener, Exxon will have the opportunity to contest the Governments' efforts and, in that context, raise any arguments Exxon believes preclude or limit the Governments' recovery under the terms of the Reopener.  Thus, the Plan does not now impose significant harm on Exxon.[4]

This Court should decline to review at this time the issues raised in Exxon's Motion. Such a challenge should be considered only if the Governments seek to enforce the Reopener before this Court and Exxon asserts a challenge then.

---

[4]  In the administrative context, Exxon's challenge also would be premature because it does not challenge final agency action.  Two criteria must be satisfied for agency action to be final: "First, the action must mark the 'consummation of the agency's decisionmaking process - - it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *City of San Diego v. Whitman*, 242 F.3d 1097, 1101 (9th Cir. 2001) (quoting *Bennett v.Spear*, 520 U.S. 154, 177-78 (1997)).  Because the Plan is still being studied and refined, and the Governments have not sought to enforce the reopener before this Court, neither criteria would be met here.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                                  Page 11 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 11 of 20

### B. Exxon's Motion is Inconsistent with Exxon's Obligations Under the Reopener as Negotiated by the Parties in the Consent Decree.

#### 1. Review of the Reopener provision should be limited to the four corners of the Consent Decree.

When interpreting the provisions of a consent decree for enforcement purposes, courts treat consent decrees as contracts. *United States v. Asarco, Inc.*, 430 F. 3d 972, 980 (9th Cir. 2005). The Ninth Circuit has held that a "consent decree, like a contract, must be discerned within its four corners, extrinsic evidence being only relevant to resolve an ambiguity in the decree." *Id.* at 980. The Ninth Circuit's decision is based on the Supreme Court's holding that consent decrees should be interpreted within their four corners because consent decrees "are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). The Supreme Court recognized that because "parties waive their right to litigate issues involved in the case" when they compromise on the precise provisions of a consent decree, the scope of a consent decree should be "construed as it is written" and "not by reference to what might satisfy the purposes of

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                          Page 12 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 12 of 20

one of the parties to it." *Id.* at 681-682.[5]  The Supreme Court has also held that, where a term used in a consent decree is not defined, it is not inconsistent with the "four corners rule" of *Armour* for a court to consider the meaning attributed to that term by ordinary usage or by whatever specialized meaning the term has in the context of the underlying lawsuit. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 240 (1975).

### 2. The Reopener applies notwithstanding any other provision of the Consent Decree and does not foreclose bioremediation, or any other clean up technique, as a possible restoration tool.

Exxon's payment obligation under the Reopener applies notwithstanding any other provision of the Consent Decree. Specifically, Paragraph 17 of the Consent Decree provides:

> Notwithstanding any other provision of this Agreement, … Exxon shall pay to the Governments such additional sums as are required for the performance of restoration projects … to restore one or more populations, habitats, or species, which, as a result of the Oil Spill, have suffered a substantial loss or a substantial decline in the areas affected by the Oil Spill … .

Decree, ¶ 17.

This is an unequivocal statement by the parties that the Reopener provision overrides any other conflicting provision of the Consent Decree. *Cisneros v. Alpine Ridge Group*, 508 U.S. 10,

---

[5]  Exxon cites some Ninth Circuit cases in which courts have applied the contract law of the state in which the consent decree was entered. *See, e.g., Wicker v. Oregon*, 543 F.3d 1168, 1174 (9th Cir. 2008). In the light of the "four corners" rule of *Armour*, Exxon incorrectly argues that the Court may apply a general principle of Alaska contract law to consider extrinsic evidence when, as is the case here, the consent decree as written is not ambiguous. Even if this Court decides to consider extrinsic evidence submitted by Exxon, such review would not affect the interpretation of the Reopener provision because, for the reasons set forth herein, the evidence is not inconsistent with the unambiguous terms of the Reopener provision or the Consent Decree as a whole. The evidence merely supports Exxon's statements that Exxon performed a technique of bioremediation, applied to the surface of oiled areas, as part of the clean-up phase and that the clean-up was declared complete in 1992. The State of Alaska does not dispute these statements.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                 Page 13 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 13 of 20

18 (1993) (explaining that use of a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section").  Without explanation, Exxon ignores this unequivocal statement and focuses instead on Paragraph 11 of the Consent Decree.  That Paragraph contains Exxon's obligations to continue clean-up operations, which, as Exxon notes, were declared complete in 1992.[6]  Decree, ¶ 11; ECF No. 309 at 3-4.  Without providing any justification for doing so, Exxon suggests that because bioremediation occurred during clean-up (under Paragraph 11), it cannot be employed as a means of restoration (under Paragraph 17).  ECF No. 309 at 7-8.

This reading of the Consent Decree is misplaced for two reasons.  First, the interpretation Exxon ascribes to the Consent Decree not only excises the "notwithstanding" clause from Paragraph 17, it impermissibly imports into Paragraph 17, twenty years after the fact,  a "clean-up exception" to Exxon's obligations under the Reopener.  Since there was no "clean-up exception" negotiated by the parties, the Consent Decree should be "construed as it is written" and "not by reference to what might satisfy the purposes of one of the parties to it."  *Armour,* 402 U.S. at 681-82; *Gates v. Rowland,* 39 F.3d 1439, 1444 (9th Cir. 1994) ("'[T]he true intent of a party is irrelevant if it is unexpressed.'") (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)), *cert. denied*, 506 U.S. 1022 (1992).

Second, there is nothing in the Consent Decree itself, or in the litigation background pursuant to which the Consent Decree was negotiated, to suggest that clean-up techniques in

---

[6]   Exxon has submitted extrinsic evidence to demonstrate that bioremediation was utilized during response operations in an effort to degrade oil on beaches.  This point provides no support for the contention that underlies Exxon's motion*, i.e.,* that because bioremediation was employed as a clean-up measure, it cannot be used as a restoration tool.

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                                          Page 14 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 14 of 20

general or bioremediation in particular cannot be employed "to restore one or more populations, habitats or species" under Paragraph 17. The terms "restore" and "restoration" are not defined in the Consent Decree, but the Court may consider the meaning attributed to those terms by ordinary usage or by whatever specialized meaning they have in the context of the underlying lawsuit without departing from the "four corners rule" of *Armour. ITT Continental Baking,* 420 U.S. at 240.

The definition ascribed to "restore" and "restoration" is "bringing back to or putting back into a former position or condition." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1936 (3d ed. 1986). Surely, utilizing bioremediation to degrade the lingering *Exxon Valdez* oil would be an attempt to bring the affected beaches back to the condition they were in prior to, or in the absence of, the Oil Spill. Exxon has not argued otherwise.

Furthermore, the lawsuits brought by the United States and the State of Alaska against Exxon sought, *inter alia*, damages under various environmental laws, most notably Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f). That Section made Defendants liable for costs or expenses incurred by the Governments "in the restoration or replacement of natural resources damaged or destroyed as a result of" the Oil Spill. The State of Alaska's complaint provided that "[t]he actual costs and damages include all costs or expenses incurred by the State of Alaska in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge and all other damages arising from the spill, including all lost use and non-use valuesincurred as a result of the spill." Docket No. 1 at 11 (attached hereto as Ex. 2); s*ee also* Decree, ¶ 1 (recognizing the Court's jurisdiction over the complaints and the parties pursuant to Section 311(f)).

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                          Page 15 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 15 of 20

Although the Clean Water Act did not define the term "restoration," the natural resource damage regulations that the Department of the Interior had promulgated in 1986 pursuant to Section 311(f) did so. "Restoration" was defined there as:

> actions undertaken to return an injured resource to its baseline condition, as measured in terms of the injured resource's physical, chemical, or biological properties or the services it previously provided, when such actions are in addition to response actions completed or anticipated, and when such actions exceed the level of response actions determined appropriate to the site pursuant to the N[ational] C[ontingency] P[lan], 40 C.F.R. §§ 300.65 and 300.68.

43 C.F.R. § 11.14(ll) (1986 ed.).[7]

Clearly, restoration actions were intended to supplement actions taken during response. As the Department of the Interior explained in adopting the rules of which this definition is a part, the primary purpose of response is to protect human health, and those in charge of response, in determining clean-up levels, are not necessarily concerned with returning the spill-affected area to baseline conditions. 51 Fed. Reg. 27674, 27687-88 (Aug. 1, 1986). This can be explained by the fact that, while the objectives of response and damage assessment overlap, they are not the same. Those charged with responding to an oil spill have as their goal removal of oil or the taking of other actions as may be necessary to minimize or mitigate further harm to health, welfare or the environment from the oil spill. But, this may not be enough to repair all of the natural resource injuries that have occurred. Therefore, restoration measures may be needed "in addition to" and "exceed[ing] the levels of" the response actions. *Id.* at 27681 and 27688.

The regulations did not identify particular measures that fell within the penumbra of

---

[7] The only change that has been made to this definition since 1986 was the deletion of the citation to 40 C.F.R. §§ 300.65 and 300.68 in 1988. 53 Fed. Reg. 5166, 5172 (Feb. 22, 1988).

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH) Page 16 of 20

Case 3:91-cv-00083-HRH Document 313 Filed 09/26/11 Page 16 of 20

"restoration," nor did they exclude any.  The clear implication is that the natural resource trustees were given broad authority in choosing means by which to effect restoration.  The goal of restoration is to return injured resources to their baseline conditions by whatever means is appropriate in the circumstances.  As the court reviewing the 1994 revisions to the Department of the Interior's 1986 natural resource damage assessment regulations stated:  "[I]t seems eminently reasonable that trustees be granted the flexibility and discretion to accommodate their solutions to the unique circumstances of each case."  *Kennecott Utah Copper Corp. v. United States Department of the Interior*, 88 F.3d 1191, 1219 (D.C. Cir. 1996).  Although the trustees are meant to build on the improvements to the environment achieved by the clean-up, neither the regulations nor common sense suggest they must avoid re-using particular response techniques.  The reference to actions that "exceed the level of" response in the definition of restoration is perfectly consistent with more intensive or refined use of the same kind of technique that was used for response.  Indeed, interpreting restoration to exclude response techniques could well foreclose trustees from considering the most efficient or effective means to address injuries.

It was against this background that the Consent Decree was negotiated, and there is simply no support for the notion that a new bioremediation technique that permits natural resource trustees to enhance the level of the Exxon Valdez Oil Spill clean-up is foreclosed as a

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                                    Page 17 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 17 of 20

restoration tool under Paragraph 17 of the Consent Decree.[8] Thus, a restoration plan that is based on a new bioremediation technique would qualify for payment under the Reopener as long as the requirements of Paragraphs17-19 are met.

Accordingly, the Court should interpret the provisions of the Consent Decree as written and give no credence to Exxon's attempt to rewrite the Reopener to exclude provisions it does not like and to include those it now wishes had been part of the bargain.

## **CONCLUSION**

For the foregoing reasons, the State of Alaska respectfully requests that the Court deny Exxon's Motion to Enforce the Consent Decree and further deny Exxon's request for an order declaring that Exxon has no further obligations pursuant to the Consent Decree with regard to "clean-up" actions under any possible Reopener claim that might be filed by the Governments.

---

[8] In fact, the permissibility of natural resource trustees' employment of restoration tools to eliminate or reduce exposure to residual oil in the environment was established formally when the National Oceanic and Atmospheric Administration published amendments to the natural resource damage assessment regulations it had promulgated in 1996 under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-2767 ("OPA"), in response to questions raised in *General Electric Co. v. U.S. Dep't of Commerce*, 187 F.3d 767 (D.C. Cir. 1997): "The Federal response agencies agree that action to eliminate or reduce exposure to oil need not occur solely under their response authorities, and can legitimately be conducted as a restoration action under OPA … ." 67 Fed. Reg. 61483, 61486 (Oct. 1, 2002).

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                                 Page 18 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 18 of 20

RESPECTFULLY SUBMITTED this 26th day of September, 2011 at Anchorage, Alaska.

        FOR THE STATE OF ALASKA

        JOHN J. BURNS
        ATTORNEY GENERAL

        By:    s/JENNIFER L. SCHORR
                Assistant Attorney General
                State of Alaska
                Department of Law
                1031 West Fourth Avenue, Suite 200
                Anchorage, Alaska 99501-1994
                Telephone: (907) 269-5274
                Facsimile: (907) 278-7022
                Email: Jennifer.Schorr@alaska.gov
                Alaska Bar #0811082

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)                                                Page 19 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 19 of 20

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 26th day of September, 2011, a copy of the foregoing OPPOSITION OF PLAINTIFF STATE OF ALASKA TO DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO ENFORCE THE CONSENT DECREE was served by U.S. mail, first class, postage paid, on the following:

| James F. Neal<br>Neal & Harwell<br>2000 One Nashville Place<br>150 Forth Avenue North<br>Nashville TN 37219 | Douglas J. Serdahely<br>Patton Boggs LLP<br>601 W. 5th Avenue, Suite 700<br>Anchorage, AK 99501 | Patrick Lynch<br>O'Melveny & Meyers<br>400 South Hope Street<br>Los Angeles, CA 90071 |
|---|---|---|
| Christine O'Sullivan<br>AK Dept. of Fish & Game<br>PO Box 115526<br>Juneau, AK 99811-5526 | John F. Clough III<br>Clough & Associates<br>PO Box 211187<br>Auke Bay, AK 99821-1187 | Cherri Womac<br>AK Dept. of Fish & Game<br>Exxon Valdez Oil Spill Trustee Council Office<br>441 W. 5th Ave., Suite 500<br>Anchorage, AK 99501 |
| Erika M. Zimmerman<br>U.S. Department of Justice<br>c/o NOAA/Damage Assessment<br>7600 Sand Point Way NE<br>Seattle, WA 98115 | | |

s/LeiNalani Silvira

OPPOSITION OF PLAINTIFF STATE OF ALASKA TO
DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO
ENFORCE CONSENT DECREE
3:91-CV-0083 (HRH)　　　　　　　　　　　　　　　　　　　　　　　Page 20 of 20

Case 3:91-cv-00083-HRH   Document 313   Filed 09/26/11   Page 20 of 20