IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| EXXON CORPORATION, et al., ) | | |
| ) | No. 3:91-cv-0082-HRH | |
| Defendants. ) | | |
| _____) | | |
| ) | | |
| STATE OF ALASKA, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| EXXON CORPORATION, et al., ) | | |
| ) | No. 3:91-cv-0083-HRH | |
| Defendants. ) | | |
| _____) | | |

O R D E R

Exxon Motion to Enforce Consent Decree

The Exxon defendants ("Exxon") move the court for an order enforcing the consent decree entered in these cases on October 9, 1991.[1] The identical decree was entered in both cases.[2] Exxon has

---

[1] Motion to Enforce Consent Decree; Docket No. 368 in <u>United States v. Exxon Corp.</u>, No. 3:91-cv-0082, and Docket No. 309 in <u>Alaska v. Exxon Corp.</u>, No. 3:91-cv-0083. Subsequent docketing references will be to the record in No. 3:91-cv-0082, with references
(continued...)

- 1 -

filed an identical motion in both cases. The United States and the State of Alaska (herein collectively referred to as the "Governments") have responded separately;[3] however, the responses are for all practical purposes identical, as are the Exxon's reply memoranda.[4] Oral argument was requested and has been heard.

On March 24, 1989, the Exxon Valdez ran aground on Bligh Reef in Prince William Sound, Alaska. Some 11 million gallons of crude oil spilled into the sound. Winds and currents carried this oil throughout the western two-thirds of Prince William Sound and into the Gulf of Alaska as far as the Kenai Peninsula, Cook Inlet, the Alaska Peninsula, and Kodiak Island. A massive response effort was undertaken by Exxon under the supervision of a federal on-scene coordinator and state on-scene coordinator. This "cleanup phase of

---

[1](...continued)
to documents in No. 3:91-cv-0083 only as necessary. Page references within the consent decree are to the CM/ECF page numbers of the document as filed in United States v. Exxon Corp., No. 3:91-cv-0082 (see Exhibit A to Declaration of Douglas J. Serdahely in Support of Exxon Motion to Enforce Consent Decree, Docket No. 369).

[2]Agreement and Consent Decree, Docket No. 369-1 in United States v. Exxon Corp., No. 3:91-cv-0082. Where previous filings have been made a part of the briefing on Exxon's motions, as is the case with the consent decree, current CM/ECF docket references are employed. Because of the age of the cases, older documents are not readily available in the CM/ECF system, but must be accessed through one (or even two) older docketing systems; however, the numbering sequence for docket entries on the two cases is consistent.

[3]Opposition to Motion to Enforce Consent Decree, Docket No. 373 in United States v. Exxon Corp., No. 3:91-cv-0082, and Docket No. 313 in Alaska v. Exxon Corp., No. 3:91-cv-0083.

[4]Reply in Support of Motion to Enforce Consent Decree, Docket No. 384 in United States v. Exxon Corp., No. 3:91-cv-0082, and Docket No. 315 in Alaska v. Exxon Corp., No. 3:91-cv-0083.

the response" was deemed to be "concluded" on June 10, 1992, by the federal on-scene coordinator.[5]

As the initial oil spill response efforts began to wind down, three related civil lawsuits were filed in this court on March 13, 1991. The first suit, <u>United States v. Alaska</u>, No. 3:91-cv-0081, grew out of a disagreement between the United States and the State of Alaska with respect to their respective shares of compensation for natural resource damages resulting from the oil spill. The Governments' litigation was terminated by the entry of a memorandum of agreement and consent decree on August 29, 1991.[6] This agreement and decree led to the creation of a co-trusteeship arrangement by which the Governments would jointly undertake collection and use of all natural resource damages recoveries. The co-trustees have received from Exxon $900 million as a consequence of the consent decree more fully described below, and have administered those funds pursuant to the memorandum of agreement.

The Governments' separate actions (the two above-styled cases) against the Exxon defendants were resolved by a single consent decree which the court approved October 8, 1991.[7] The consent decree resolved all claims as to all parties, and the court "retain[ed] jurisdiction of this matter for the purpose of entering such further orders, direction, or relief as may be appropriate for the construction, implementation, or enforcement of this Agree-

---

[5] Docket No. 369-10.

[6] Docket No. 385-3.

[7] Agreement and Consent Decree at 30, Docket No. 369-1.

ment."[8]  The following portions of the consent decree are relevant to Exxon's motion for enforcement of the consent decree.

By the consent decree, Exxon committed itself to "continue clean-up work" as directed by the respective state and federal on-scene coordinators.[9]  However, paragraph 11(b) of the consent decree provides in pertinent part that:

> (b) Upon Final Approval, Exxon shall have no further obligations with respect to clean-up of the Oil Spill except as set forth in this Agreement and in addition Exxon shall be entitled to a credit, to be applied to the next payment due from Exxon to the Governments, as provided in subparagraph 8(b), for all Expenditures incurred by Exxon for clean-up work pursuant to directions of the [on-scene coordinators].[10]

In due course, the consent decree became final and binding on the parties.

By the terms of the consent decree, the Governments expressly released Exxon from claims for natural resource damages,

> provided, however, that nothing in this Agreement shall affect or impair the following:
>
> (a) claims by either Government to enforce this Agreement, including without limitation Exxon's agreement to make additional payments as set forth in Paragraphs 17-19....[11]

At the heart of the arguments made in the motions and responses before the court is paragraph 17 of the consent decree

---

[8]Agreement and Consent Decree at 29, Docket No. 369-1.

[9]Agreement and Consent Decree at 11, Docket No. 369-1.

[10]Agreement and Consent Decree at 12, Docket No. 369-1.

[11]Agreement and Consent Decree at 14-15, Docket No. 369-1.

- 4 -

which is entitled "Reopener for Unknown Injury".[12] The reopener provides:

> 17. Notwithstanding any other provision of this Agreement, between September 1, 2002, and September 1, 2006, Exxon shall pay to the Governments such additional sums as are required for the performance of restoration projects in Prince William Sound and other areas affected by the Oil Spill to restore one or more populations, habitats, or species which, as a result of the Oil Spill, have suffered a substantial loss or substantial decline in the areas affected by the Oil Spill, provided, however, that for a restoration project to qualify for payment under this paragraph the project must meet the following requirements:
>
> (a) the cost of a restoration project must not be grossly disproportionate to the magnitude of the benefits anticipated from the remediation; and
>
> (b) the injury to the affected population, habitat, or species could not reasonably have been known nor could it reasonably have been anticipated by any Trustee from any information in the possession of or reasonably available to any Trustee on the Effective Date.[13]

On May 31, 2006, the Governments delivered to Exxon, pursuant to the reopener provision of the consent decree, their "Comprehensive Plan for Habitat Restoration."[14] On August 31, 2006, the Governments delivered to Exxon their demand for payment of the estimated cost of implementing the plan: $92,240,982.00.[15] The

---

[12] Agreement and Consent Decree at 18, Docket No. 369-1.

[13] Agreement and Consent Decree at 18-19, Docket No. 369-1.

[14] Declaration of Kimberly A. Trust at 2, Docket No. 373-1; and Attachment A, Comprehensive Plan for Habitat Restoration, Docket No. 373-1 at 6.

[15] Docket No. 369-4.

- 5 -

parties entered into a tolling agreement as to any applicable period of limitations so that they might engage in discussions and exchange scientific information. The tolling agreement was terminated June 25, 2010, by Exxon based upon perceived difficulties with the exchange of information from the Governments to Exxon.[16] The motions now before the court followed in August 2011. Not before the court is any claim by the Governments for enforcement of the reopener based upon their demand for payment.

Is Exxon's Motion to Enforce Consent Decree
Premature or Not Ripe?

The Governments' responses contend that Exxon's motions to enforce the consent decree are premature because the Governments have only taken the threshold step of submitting a plan and a demand for payment to Exxon. The Governments point out that they have not yet filed a request with the court for enforcement of the reopener provision of the consent decree. They observe that the court has heretofore emphasized that a possible claim under the reopener belongs to the Governments which are still evaluating the merits of their plan and demand for payment.

The instant motions call upon the court to interpret the reopener provision of the consent decree. Exxon contends that the Governments may not use the reopener to require further cleanup work or compensation for such work inasmuch as the consent decree expressly releases Exxon from cleanup obligations. Exxon contends that the Governments' plan contemplates additional cleanup work,

---

[16]Docket No. 385-2.

not restoration work. Acknowledging that the Governments are still evaluating their plan, Exxon in substance argues that the Governments are limited by the plan which they presented in May 2006, and that it simply calls for more cleanup work even though the cleanup work was concluded in June of 1992.

The court concludes that Exxon's motions are indeed premature. Exxon's motions certainly suggest that there is a difference of opinion between it and the Governments as regards interpretation of the consent decree. The court has expressly retained jurisdiction for purposes of the construction and enforcement of the consent decree. However, the instant motions call upon the court to, in essence, render an advisory opinion on an interpretation disagreement with respect to a claim that has not yet been put before the court. Indeed, it may be that after further evaluation of its demand upon Exxon, the Governments could decide not to pursue the matter. In that event, the matter which Exxon would have the court decide would be moot.

Moreover, unless and until a formal claim is presented to the court by the Governments, the court has no way of knowing precisely what the Governments will claim. If a claim is presented, it could conceivably be constructed in a fashion which avoids the issue that Exxon would have the court decide. In other words, the interpretation analysis may be different, depending upon how the Governments present their claim – if they present a claim.

The Governments also contend that the matter which Exxon would raise through its motions is not ripe for disposition. Ripeness

doctrine does not really apply in this situation. Exxon and the Governments are not engaged in any administrative proceedings. The decision which the Governments must make is a unilateral one, based upon the facts which they are able to develop that may support a claim under the reopener provision of the consent decree.

Exxon replies to the Governments' foregoing arguments, contending that it will suffer hardship if the court were to decline to entertain their motions at this time. The court perceives no undue hardship flowing from its decision to stay its hand unless and until the Governments present a claim for enforcement of the reopener clause. The possibility of a reopener claim has been "on the table" since the consent decree was finalized. The Governments presented a plan and made a demand upon Exxon under the reopener clause at the last possible time for doing so, but that is precisely what the consent decree contemplated as a possibility.

That the possibility of a reopener claim has dragged on for so long is in part a consequence of the tolling arrangement to which Exxon agreed. The court and the public would like to see this matter resolved, but aside from the uncertainty of whether or not a claim will ever be presented, Exxon presently suffers no particular harm. Its business is not in any fashion disrupted or impeded because of the uncertainty of a claim by the Governments. Exxon does not have to devote any time or resources to this matter unless it chooses to do so. In that regard, the court urges the parties to quickly resolve this matter themselves if they are able to do so; but at this juncture, it really is up to the Governments to

decide what they are going to do, and simply waiting out the Governments imposes no particular hardship on Exxon.

The motions to enforce the consent decree are denied.

DATED at Anchorage, Alaska, this 15th day of February, 2012.

/s/ H. Russel Holland<br>United States District Judge

- 9 -

Case 3:91-cv-00083-HRH   Document 329   Filed 02/15/12   Page 9 of 9