CRAIG W. RICHARDS
ATTORNEY GENERAL

STEVEN E. MULDER
Assistant Attorneys General
State of Alaska
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska  99501-1994
Telephone: (907) 269-5274
Facsimile: (907) 278-7022
Email: steve.mulder@alaska.gov

*Attorneys for the State of Alaska*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ALASKA**

| | |
|---|---|
| STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) No. 3:91-CV-0083 (HRH) |
| | ) |
| v. | ) **STATUS REPORT BY THE** |
| | ) **STATE OF ALASKA AND** |
| EXXON CORPORATION, and EXXON SHIPPING COMPANY, | ) **THE UNITED STATES** |
| | ) |
| Defendants. | ) |
| | ) |

## INTRODUCTION AND SUMMARY

The United States and the State of Alaska ("Governments") jointly present this final report to the Court concerning the Reopener for Unknown Injury ("Reopener") in the 1991 Consent Decree between the Governments and corporate predecessors of Exxon Mobil Corporation ("Exxon" or "Defendants") relating to the March 1989 *Exxon Valdez* oil spill ("Spill" or "EVOS").[1]

The 1991 Consent Decree settled the Governments' civil claims against Exxon arising

---

[1] A corresponding status report is being filed today in the United States' case against Exxon (3:91-cv-0082 (HRH)).

from the Spill, including claims for natural resource damages ("NRD"). It required Defendants to pay a total of $900 million to reimburse past government costs and to fund natural resource restoration work by a Trustee Council made up of three federal and three state agencies (the "Trustees").[2] The settlement was final except for a "reopener" provision, which allowed the Governments to seek up to $100 million in additional restoration costs under narrow circumstances. The Reopener could only be invoked during a limited period, from September 1, 2002 to September 1, 2006, and in order to invoke it the Governments were required to (1) show a "substantial loss or substantial decline" in "one or more populations, habitats, or species" resulting from the Spill that was unknown and could not reasonably have been anticipated when the settlement became effective; and (2) present to Exxon a "detailed" plan for restoring the unforeseen substantial loss or decline at a cost not grossly disproportionate to the plan's benefits. Consent Decree, Dkt. No. 46, ¶¶ 17-19. At the time the Consent Decree was finalized, the Governments explained that the Reopener was "insurance against uncertainty in the scope of injury" identified pre-settlement, but their assessment of damages at that time led them to believe that they would not ever need to invoke it. Governments' Memorandum in Support of Agreement and Consent Decree, Dkt. No. 43, pp. 27-28.

In the years leading up to 2006, the Governments took a hard look at whether the Spill had left any major, unhealed scars that were unforeseeable in 1991 and could be repaired by specific restoration actions. That hard look revealed one candidate for using the Reopener: the discovery of relatively unweathered *Exxon Valdez* oil in subsurface, intertidal areas of some

---

[2] The Trustee agencies are: for the United States, the National Oceanic and Atmospheric Administration ("NOAA"), the Department of the Interior ("DOI"), and the U.S. Department of Agriculture – Forest Service ("USDA"); and for the State, the Alaska Departments of Environmental Conservation ("ADEC"), Fish and Game ("ADF&G"), and Law.

Spill area beaches that serve as foraging habitat for sea otters and harlequin ducks. Although these areas of "lingering oil" occurred on only a small fraction of the original oiled beaches, the Governments viewed them as a "substantial loss of habitat" because the continuing exposure of otters and harlequin ducks to the oil appeared to be impeding the recovery of those species from the effects of the Spill.[3]

The Governments developed a plan of actions to address the lingering oil ("Habitat Restoration Plan" or "Plan") and served it on Exxon just before the deadline established in the Consent Decree. The Governments subsequently demanded $92 million from Exxon, based on the estimated costs of implementing the Plan. Dkt. Nos. 369-2 and 369-4.[4]

Since 2006, the Governments and the Trustee Council have overseen several phases of scientific studies, design work, and pilot testing of technology contemplated in the Habitat Restoration Plan. The Trustee Council has also continued to monitor natural resources that it had identified as not recovered from the effects of the EVOS. These efforts were all performed in the public eye, with final reports available on the Trustee Council's website. Among other results, this work has deepened scientific understanding of the behavior and persistence of oil in Prince William Sound, and identified and tested refined bio-restoration techniques. This work

---

[3] *See generally* Peterson, C.H. *et al.*, Long-Term Ecosystem Response to the Exxon Valdez Oil Spill, Science, Vol. 302, p. 2083 (2003); Integral Consulting, Inc., 2005 Assessment of Lingering Oil and Resource Injuries from the Exxon Valdez Oil Spill, pp. xxi and xxv, published at http://www.evostc.state.ak.us/Store/FinalReports/2004-040776-Final.pdf ("Integral 2005 Assessment").

[4] The Governments' May 31, 2006 letter transmitting the Plan to Exxon stated that $92 million was a preliminary estimate that would be refined as studies and design work called for by the Plan proceeded. The Governments invited Exxon to fund and participate in the work needed to provide a more fully-defined Plan and cost estimate. Dkt. No. 369-2, pp. 3-4. When those discussions did not produce an agreement, the Trustee Council chose to undertake the studies and design work using NRD funds remaining from the 1991 settlement.

has also documented strong improvements in the measures of harlequin duck and sea otter health that in 2006 had pointed to their exposure to lingering oil as continuing to negatively affect their ability to rebound from the Spill. In November 2014, based on the most recent monitoring results, the Trustee Council formally reclassified both sea otters and harlequin ducks as "recovered" from the EVOS.[5]

Taking into account the results of all of these studies and the Trustee Council's determinations, the Governments now advise the Court that they will not file a Reopener claim and that this litigation will remain closed. Among other reasons for this decision, the documented recovery of sea otters and harlequin ducks has negated the claim that the patches of lingering oil in some Spill area beaches amount to a "substantial loss or substantial decline" in a population, habitat, or species within the meaning of the Reopener.

This decision does not preclude further action to address the lingering oil. The Trustees still control more than $200 million in NRD settlement funds that may be used for this and other restoration purposes. The Trustee Council and its member agencies have discretion to consider and proceed with actions to reduce residual oil in the Spill area without having to meet the high legal bar set in the Reopener.

## DISCUSSION

### The Oil Spill and Cleanup

The March 23-24, 1989 grounding of the tanker vessel *Exxon Valdez* on Bligh Reef in Prince William Sound and the ensuing spill of nearly eleven million gallons of North Slope crude oil contaminated nearly 1,750 kilometers ("km") of Alaska's coastline and is estimated to have

---

[5] *Exxon Valdez* Oil Spill Restoration Plan: 2014 Update Injured Resources and Services, pp. 19-20 & 31-32 (Adopted by the Trustee Council November 19, 2014 and available at

killed some 250,000 seabirds and shore birds, 2,700 sea otters, 300 harbor seals, and countless salmon and herring eggs. Plants and animals that populated the intertidal zone suffered greatly from the Spill and from cleanup measures. The Spill also disrupted the lives and livelihoods of thousands of people who lived in and used the affected area, most notably fishermen and those who normally gathered subsistence resources from the marine environment.[6]

Exxon undertook cleanup efforts at the direction of the United States Coast Guard, with advice from federal and state agencies and assistance from a host of private volunteers, including a fleet of fishing vessels that helped deploy boom. Exxon performed beach cleanups using a variety of techniques, including manual cleaning of rocks, high-pressure hot-water washing, and the application of fertilizers to stimulate the activity of bacteria that metabolize oil in the environment. The cleanup phase of the Governments' response to the Spill ended in June of 1992.[7]

### Settlement of the Federal and State Governments' Claims

In 1990, a federal indictment was issued against Exxon for violations of the Clean Water Act, 33 U.S. C. §§ 1311(a) and 1319(c)(1)(A), the Refuse Act, 33 U.S.C. §§ 407 and 411, and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a). *United States v. Exxon Corp.,* No. A90-015 CR (HRH), Dkt. No. 1. The United States and the State also filed separate civil actions against Exxon. The United States' civil Complaint, filed in March 1991 under the Clean Water Act and other statutory and Admiralty law authorities, sought recovery of unreimbursed

---

www.evostc.state.ak.us)("2014 Injured Resources and Services Update").

[6]  *See, e.g., Exxon Valdez* Oil Spill Trustee Council: Oil Spill Facts – Questions and Answers http://www.evostc.state.ak.us/index.cfm?FA=facts.QA

[7]  *See* Dkt. No. 369-5, p. 2 (June 12, 1992 Press Release of Federal and State On-Scene Coordinators)

cleanup costs, a civil penalty, injunctive relief, and damages for injuries to natural resources resulting from the Spill.[8]

On October 8, 1991, this Court approved: (1) a plea agreement resolving the federal government's criminal claims against Exxon; and (2) an Agreement and Consent Decree (the "Consent Decree"), filed both in this case and in the companion State case, resolving all civil claims between the Governments and Exxon. Under the plea agreement, Exxon agreed to a fine of $150 million, of which $125 million was remitted based on (among other factors) the companies' cooperation during cleanup, and restitution payments of $50 million to each of the Governments. Dkt. No. 228, pp. 5-10 (in A90-015 CR (HRH)). Under the civil Consent Decree, Exxon was required to continue cleanup work until the Coast Guard determined it was complete and to pay the Governments $900 million in ten installments beginning in December of 1991. The Decree provided that, after reimbursement of cleanup, damages assessment, and State litigation costs, the civil payments were to be used jointly by the United States and the State to complete the assessment of injury resulting from the Spill and to "plan, implement, and monitor the restoration, rehabilitation, or replacement of natural resources, natural resource services, or archeological sites and artifacts injured as a result of the [Oil] Spill, or the acquisition of equivalent resources or services[.]" Consent Decree, Dkt. No. 46, ¶¶ 8-11.

---

[8] The State also brought natural resource damages claims under the Clean Water Act against Exxon in this Court. *State of Alaska v. Exxon Corp.,* No. 3:91-CV-0083 (HRH). It had previously sued Exxon for damages in State Superior Court under Alaska statutory and common law claims. *Alaska v. Exxon Corp.,* Civ. No. 3AN-89-6852.

## The Trustee Council's Restoration Program

The Governments created an entity known as the *Exxon Valdez* Oil Spill Trustee Council (the "Trustee Council") to manage and expend the settlement monies from Exxon. The Trustee Council is composed of one representative from each of the Trustees (identified in note 2, supra) and its members must act unanimously.[9]

In 1994, the Trustee Council adopted a Restoration Plan that guides its restoration decisions.[10] The 1994 Restoration Plan recognizes three main categories of restoration: 1) general restoration – manipulating the environment, managing human use, and reducing marine pollution; 2) habitat protection and acquisition; and 3) monitoring and research.[11] A portion of the original settlement monies was set aside in a Restoration Reserve account in recognition of the fact that complete recovery from the Spill would likely not be complete by 2001, when the last payment from Exxon was scheduled to occur.[12] The Restoration Plan also established mechanisms for public and scientific review of proposed restoration projects and for transparency in Trustee Council decisions and operations.[13]

Through acquisitions and easements, the Trustee Council has protected habitat on over 500,000 acres of land in the vicinity of Prince William Sound and Kodiak Island and has devoted

---

[9] The Trustee Council is governed by a Memorandum of Agreement and Consent Decree approved by this Court in August 1991, Dkt. No. 8 (A91-081 CV (HRH)), under which the Governments agreed to act jointly to seek recovery of natural resource damages from Exxon and to spend any recoveries for restoration or replacement of injured resources.

[10] *Exxon Valdez* Oil Spill Restoration Plan, published at http://www.evostc.state.ak.us/Universal/Documents/Restoration/1994RestorationPlan.pdf.

[11] *Ibid.,* Chapter 3, pp. 19-28.

[12] *Id.* at 27.

[13] *Id.* at 16-17.

over $250 million to other types of restoration and monitoring activities.[14]  Due to income earned on the settlement funds, the Trustee Council currently has more than $200 million at its disposal for future restoration.[15]

### Terms of the Reopener Provision

The Consent Decree includes a provision entitled "Reopener for Unknown Injury" that allowed the Governments to seek additional payments of up to $100 million from Exxon, between September 1, 2002 and September 1, 2006, for restoration projects that are designed to restore one or more populations, habitats, or species which, as a result of the Spill, have suffered a substantial loss or substantial decline that was not known and could not reasonably have been anticipated at the time of the settlement.  Consent Decree, Dkt. No. 46, ¶¶ 17-19.

The Reopener is similar in concept to the reservations of rights with respect to unknown conditions and new information that the United States often includes in settlements of claims for remedial actions or for natural resource damages at hazardous waste sites and in connection with oil spills.  Such provisions are exceptions to the general goal of settlement to achieve repose for the litigants and are negotiated because, even after a careful investigation, uncertainties about the extent and effects of contamination often remain.  In this case, bargaining over the scope of the Reopener was intense, with Exxon arguing that the very large sum it was paying for natural resource restoration was sufficient to address unknown conditions and that no further reservation was warranted.

---

[14]    *See generally* http://www.evostc.state.ak.us.

[15]    This figure comes from the Alaska Department of Revenue and is published at http://treasury.dor.alaska.gov/Investments/Exxon-Valdez-Oil-Spill-Investment-Fund.

The reservation ultimately agreed to is unique and includes a number of limiting conditions:

-It could be invoked only during the four-year period between September 1, 2002 and September 1, 2006.

-Instead of showing only an "injury" to natural resources – the basic statutory standard for a natural resource damages claim – the Governments must prove that one or more populations, habitats, or species has suffered a "substantial loss or substantial decline" as a result of the Spill that was unknown and could not reasonably have been anticipated at the time of settlement.

-The claim is limited to "such additional sums [up to $100 million] as are required for the performance of restoration projects" to restore the affected populations, habitats, or species – a standard that precludes recovery for interim losses.

-The Governments must serve "detailed plans" and cost estimates for any such project on Exxon at least 90 days before demanding payment and must show that the costs sought are not grossly disproportionate to the project's benefits. *Id.*

### The Habitat Restoration Plan Presented to Exxon in 2006

As the deadline for initiating a Reopener claim approached, the Governments carefully evaluated potential claims, and the State commissioned a synthesis report on the current conditions of affected natural resources, prepared by a team of experts from Integral Consulting, Inc. and presented to the Trustee Council in 2005.[16] The State, with participation of federal representatives, held a series of public meetings in communities in or near the Spill area, seeking input on the Reopener issues. Ultimately, the Governments determined that *Exxon Valdez* oil

Case 3:91-cv-00083-HRH   Document 375   Filed 10/14/15   Page 9 of 19

found in still-toxic form in the intertidal zones of some Spill area beaches was the only unanticipated injury that qualified for consideration under the Reopener.

In 2001, NOAA conducted beach surveys that revealed the presence of relatively unweathered, still toxic *Exxon Valdez* oil in the intertidal zone. NOAA confirmed those initial findings with further surveys in 2003 and calculated that the oil was degrading naturally at a far slower rate (0-4% per year) than anticipated and therefore was still bioavailable to species that dug into the sediments in search of food. In particular, the lingering oil was identified as a likely factor limiting recovery from the Spill of two intertidal predator species – sea otters and harlequin ducks.[17]

On May 31, 2006, the Governments submitted to Exxon the Habitat Restoration Plan,[18] followed by an August 31, 2006 demand for payment of $92 million to implement the Plan. Dkt. Nos. 369-2 and 369-4. The Governments announced the Plan and made it publicly available.[19] The $92 million demand was a conservatively high figure that assumed active restoration work would occur at most sites thought to harbor lingering oil.[20]

The Plan called for a series of studies to understand the conditions that were slowing the expected natural degradation of the oil and to design specific bio-restoration measures to enhance that rate. The Governments anticipated refinement of the Plan based upon the results of the

---

[16] Integral 2005 Assessment, *supra* note 3.

[17] *See* http://www.evostc.state.ak.us/index.cfm?FA=status.lingering – NOAA Lingering Oil Report (January 2010) ("2010 Lingering Oil Report") and references cited therein.

[18] The Habitat Restoration Plan is available at http://www.evostc.state.ak.us/index.cfm?FA=facts.reopener.

[19] The Governments' press release is available at http://www.justice.gov/archive/opa/pr/2006/June/06_enrd_340.html.

[20] Habitat Restoration Plan, *supra* note 18, at 15-16.

studies. The Plan consists of six phases: (1) determining the locations, approximate amounts, and chemical states of all significant remaining deposits of oil; (2) identifying the factors limiting the natural oil degradation processes; (3) evaluating bio-restoration technologies to accelerate the natural degradation processes, recognizing that there might be other potential means of restoring oiled sites; (4) pilot testing of selected bio-restoration technologies; (5) drafting a plan for restoration work at selected beaches for public review and comment; and (6) implementing the selected restoration work.[21] The Plan also contemplated termination in the event that the results of any phase dictate against proceeding further, *e.g.*, if feasible methods of bio-restoration could not be identified or were not cost-effective.[22]

**Studies and Results Since 2006**

1. Studies to refine restoration methods

Since 2006, the Governments have proceeded with the study phases of the Plan (Phases 1-4, identified above) using the settlement funds held by the Trustee Council.[23] As the Governments have previously reported to the Court, the study phases took more time than anticipated. They are now complete. In brief, these studies: 1) produced a model for predicting where oil is likely to be found and in what quantities;[24] 2) identified the factors limiting natural

---

[21] *Id.* at 1 and 6-16.

[22] *Id.* at 16-17 and 19.

[23] This evaluation of lingering oil is clearly consonant with the Trustee Council's restoration mission as well as with the Plan prepared under the Reopener. As noted above, the Governments invited Exxon to participate in or pay for these steps, but Exxon declined.

[24] Michel, J., *et al*. 2010. Distribution of subsurface oil from the *Exxon Valdez* oil spill. *Exxon Valdez* Oil Spill Restoration Project Final Report (Restoration Project 070801), National Oceanic and Atmospheric Administration, Juneau, AK, published at http://www.evostc.state.ak.us/index.cfm?FA=searchResults.projectInfo&Project_ID=1559 ("Michel 2010").

degradation of oil – primarily the lack of sufficient amounts of oxygen and nutrients in contact with the oil;[25] 3) developed and pilot-tested a bio-restoration technology – injection of oxygen and nutrients into the substrate beneath patches of lingering oil – that has the potential to enhance the natural oil degradation process at some, but not all, affected sites;[26] and 4) identified sites known or predicted by the model (using certain assumptions described below) to contain lingering oil that are candidates for additional restoration work, technically feasible methods to restore each site, and the estimated costs of doing so.[27]

The lingering oil model indicates that, at any chosen threshold and criteria, the length of shoreline containing lingering oil patches of potential concern is very small relative to the total length of shoreline (1,750 km) initially oiled during the Spill. For example, using a 90% positive predictive value cutoff, the model indicates that there are likely 167 sites with some amount of subsurface oil, but only 64 sites with moderately or heavily oiled residues, occurring along a total of 3.57 km of shoreline.[28] The final results of the bio-restoration pilot testing, published in February 2015, showed that at all study sites in 2011 and 2012 there was a post-treatment decrease in the site-wide average concentration of total polycyclic aromatic hydrocarbon ("TPAH") compounds (the toxic components of the oil) that exceeded the 0-4% rate/year of decrease expected naturally; however, the results were variable among the test sites and across

---

[25] *See* 2010 Lingering Oil Report, *supra* note 17.

[26] Boufadel, M., *et al*. 2014. Pilot Studies of Bioremediation of the *Exxon Valdez* Oil in Prince William Sound Beaches, *Exxon Valdez* Oil Spill Restoration Project Final Report (Restoration Project 11100836) ("Boufadel 2014"), published at http://evostc.state.ak.us/index.cfm?FA=searchResults.projectInfo&Project_ID=2189.

[27] Boufadel, M.C. *et al. 2015,* Priorities, Methods, and Costs For Restoration of Lingering Subsurface Oil from the *Exxon Valdez* Oil Spill in Prince William Sound, Alaska, published at http://www.evostc.state.ak.us/Store/FinalReports/2015-15150121-Final.pdf ("Boufadel 2015").

[28] Michel 2010, *supra* note 24 at 110, Table 18.

the two pilot-testing years.[29] Based on these results, the scientists recommended the bio-restoration technology be considered a feasible restoration option for only those lingering oil sites with relatively large or concentrated patches of contamination and a relatively thick substrate. Those sites represent a small proportion of the sites with lingering oil.[30]

The most recently completed report identifies 63 Spill-area sites where oil is known or predicted to linger beneath the surface of the shoreline as candidates for further restoration actions.[31] Of those, nine are identified as technically suitable for bio-restoration; at the remaining 54 sites, only manual removal is deemed a feasible proactive restoration technique.[32] At all of these sites, further analysis of other factors, including a weighing of environmental and economic costs and benefits, is necessary before decisions are made on whether any additional restoration should be performed.[33]

2. Monitoring of species recovery

While the Plan's study phases were being implemented, the Trustee Council continued to monitor the recovery of species, including sea otters and harlequin ducks. The studies of otters and harlequins since 2006 have shown trends towards reduced exposure of these species to oil in the Spill area and towards recovery to pre-Spill population status. The most recent data, collected as of 2013, indicate that both species now meet the recovery criteria established by the Trustee Council, *i.e.*, there is no longer a significant difference in indices of oil exposure between populations in oiled and unoiled areas and populations have returned to pre-Spill conditions.

---

[29] Boufadel 2014, *supra* note 26.

[30] *See id.* at 33-34 & Table 4 (43).

[31] *See* Boufadel 2015, *supra* note 27, at pp. 19-25 (Tables 2-4).

[32] *Id.*

[33] *Id.* at 2 and 36.

Case 3:91-cv-00083-HRH   Document 375   Filed 10/14/15   Page 13 of 19

The Trustee Council based its decision to update the status of both species to "recovered" on its Injured Resources and Services List on the results of these studies.

With regard to harlequin ducks, the data indicate that some effects of oil exposure on ducks, including differing female winter survival probabilities between areas oiled by the Spill and unoiled areas, persisted through at least 1998 but abated by 2000-2003. As projected by a population model, the duck population recovered to pre-Spill numbers about 2013.[34] Scientists collected data approximately every two years to analyze metrics indicating oil exposure of ducks in areas oiled by the Spill relative to unoiled areas. Findings through 2011 continued to show a difference in oil exposure of ducks between oiled and unoiled areas, but the trend was towards lower oil exposure over time. The data collected in 2013 showed no detectable difference in oil exposure between ducks in areas oiled by the Spill and unoiled areas, and this result was confirmed in 2014.[35]

The monitoring efforts for sea otters in the Spill area have included, *inter alia*, annual aerial surveys to assess population abundance; analysis of carcasses to determine age-at-death; studies of gene transcription rates to assess potential indicators of oil exposure; and histopathology studies of sea otter livers to assess factors affecting the likelihood of survival of otters within the Spill area. The sea otter data, like that associated with harlequin ducks, generally indicate gradual recovery of sea otter populations over time, with the overall sea otter population in the Spill area returning to pre-Spill levels and pre-Spill mortality patterns by

---

[34] Esler, D., *et al*. 2015. Long-term monitoring: lingering oil evaluating chronic exposure of harlequin ducks and sea otters to lingering *Exxon Valdez* oil in Western Prince William Sound, *Exxon Valdez* Oil Spill Trustee Council Restoration Project Final Report (Project 12120114-Q), Pacific Wildlife Foundation and Centre for Wildlife Ecology, Simon Fraser University, Delta, British Columbia, Canada), published at http://www.evostc.state.ak.us/index.cfm?FA=searchResults.projectInfo&Project_ID=2204.

2013.[36]  The scientists concluded that the exposure of pups and juveniles to lingering oil likely decreased to biologically insignificant levels sometime in the early to mid-2000s, with the last of the affected age classes dying out by the early 2010s.[37]  Consistent with the abundance and mortality pattern data, the liver health of sea otters in oiled areas was slightly poorer than those from unoiled areas through 2008, which may have translated to poorer survival through that time, but the effects from exposure to lingering oil appear to have declined by 2012.[38]  Based on these findings, the scientists concluded that continuing exposure to oil is no longer of biological significance to sea otters in the Spill area and the status of sea otters is consistent with the recovery criteria established by the Trustee Council.[39]

**The Governments' Decision Not to Proceed Under the Reopener**

The primary goal of the Habitat Restoration Plan was to implement a bio-restoration technique tailored to the unique conditions of the beaches in the Spill area, in order to accelerate the natural rate of oil degradation and thereby boost the recovery of harlequin ducks and sea otters by reducing their exposure to this source of oil.  While there may still be value in addressing lingering oil for other reasons, the patches of lingering oil that remain can no longer

---

[35]     *Id.*

[36]     Ballachey, B.E., *et al*. 2014. 2013 update on sea otter studies to assess recovery from the 1989 *Exxon Valdez* oil spill, Prince William Sound, Alaska: U.S. Geological Survey Open-File Report 2014-1030, 40 p., ("USGS Open File Report"), published at http://dx.doi.org/10.3133/ofr20141030.

[37]     *Id.*

[38]     Ballachey, B.E., *et al*. 2014. Synthesis of nearshore recovery following the 1989 *Exxon Valdez* oil spill: Sea otter liver pathology and survival in Western Prince William Sound, 2001 – 2008, *Exxon Valdez* Oil Spill Restoration Project Final Report (Restoration Projects 070808 and 070808A), U.S. Geological Survey, Alaska Science Center, Anchorage, Alaska, published at http://evostc.state.ak.us/Store/FinalReports/2007-070808-Final.pdf.

[39]     USGS Open File Report, *supra* note 36, at 16.

be considered an impediment to the recovery of sea otters or harlequin ducks or a significant ongoing threat to their now-restored populations in the Spill area. The Trustee Council's determination that those species are now recovered from the Spill, and the careful scientific research that led to and supports those determinations, mean that the facts no longer support the Governments' position that this residual oil is a "substantial loss or substantial decline" in a population, habitat, or species. Under these circumstances, the United States and the State of Alaska will not seek to reopen this case to enforce their 2006 demand to Exxon under the Reopener for Unknown Injury and have withdrawn that demand. [40]

### Potential Further Steps to Address Lingering Oil

As noted above, the Trustee Council's mission is to use the recoveries from Exxon to restore, replace, enhance, or acquire the equivalent of natural resources lost or injured by the Spill and the services lost or reduced because of those lost or injured resources. The Trustee Council has great latitude in carrying out its restoration mission. If there are reasons to pursue restoration of oiled beaches other than to reduce exposure of harlequin ducks and sea otters to lingering oil, the Trustee Council is not constrained by the Governments' decision not to pursue the Reopener. Nor is it bound by the terms of the Reopener. Specifically, there is no requirement under applicable laws that there be a finding of substantial loss or decline that was

---

[40] Recently published NOAA-led research suggests that the toxicity of *Exxon Valdez* oil to the 1989 year-class of Pacific herring spawn in Prince William Sound likely was underestimated originally and may explain the post-Spill crash of the Sound's herring fishery. Incardona, J.P. *et al.,* Very Low Embryonic Crude Oil Exposures Cause Lasting Cardiac Defects in Salmon and Herring, Scientific Reports: Article No. 13499 (2015), published at http://www.nature.com/articles/srep13499. These findings have no bearing on the decision announced here. Lingering oil is not thought to be affecting herring spawn, eggs or larvae, *see* 2014 Injured Resources and Services Update, *supra* note 5, at 26-28, and there is no evidence that removing lingering oil would assist in restoration of the herring fishery.

unknown and unforeseeable at the time the Consent Decree became effective. Nor are the Trustee Council's options for addressing lingering oil limited to the particular methods described in the Habitat Restoration Plan. The Trustee Council previously noted that it would evaluate the need for active remediation of the lingering oil once the Reopener issue was resolved.[41] With the results of the lingering oil studies conducted pursuant to the Governments' Habitat Restoration Plan now available and the Reopener decision made, it is well situated to begin that process.

RESPECTFULLY SUBMITTED this 14th day of October, 2015.

FOR THE STATE OF ALASKA

CRAIG W. RICHARDS
ATTORNEY GENERAL

By: s/STEVEN E. MULDER
Chief Assistant Attorney General
State of Alaska
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501-1994
Telephone: (907) 269-5274
Facsimile: (907) 278-7022
Email: steve.mulder@alaska.gov
Alaska Bar No. 8106039

s/JENNIFER L. SCHORR
Assistant Attorney General
State of Alaska
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501-1994
Telephone: (907) 269-5274
Facsimile: (907) 278-7022
Email: jennifer.schorr@alaska.gov
Alaska Bar No. 0811082

---

[41] EVOS Trustee Council Invitation for Proposals: Federal Fiscal Year 2012, pp. 20-21, published at
http://www.evostc.state.ak.us/Universal/Documents/Publications/Invitations/2012Invitation.pdf.

FOR THE UNITED STATES

        <u>s/ERIKA M. ZIMMERMAN (consent)</u>
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
 c/o NOAA/Damage Assessment
7600 Sand Point Way, NE
Seattle, Washington 98115
Telephone: (206) 526-6608
Facsimile: (907) 526-6665
Email: Erika.Zimmerman@usdoj.gov

Status Report By The State of Alaska & The United States
3:91-CV-0083 (HRH)   Page 18 of 19
Case 3:91-cv-00083-HRH   Document 375   Filed 10/14/15   Page 18 of 19

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on October 14th, 2015, a copy of the foregoing *Joint Status Report by the United States and the State of Alaska* was served by the Court's Electronic Case Management system upon all persons registered to receive filings in this matter, and a copy was served by e-mail to the following person:

Richard Steiner
Box 666, 9138 Arlon St., Ste A3
Anchorage, AK 99507
Richard.g.steiner@gmail.com

                                 s/Steven E. Mulder

Status Report By The State of Alaska & The United States
3:91-CV-0083 (HRH)                                                      Page 19 of 19
Case 3:91-cv-00083-HRH   Document 375   Filed 10/14/15   Page 19 of 19